## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**SUSAN YOUNG,**                               )
                                               )          **CIVIL ACTION**
            **Plaintiff,**            )
                                               )          **NO. 4:13-cv-40154-TSH**
            **v.**                    )
                                               )
**AETNA LIFE INSURANCE COMPANY**               )
**AND CHILDREN'S HOSPITAL BOSTON**             )
**GROUP LONG TERM DISABILITY**                 )
**PLAN,**                                      )
                                               )
            **Defendant.**            )
_____ )

## ORDER AND MEMORANDUM ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
### (Docket Nos. 40 & 42)

**November 16, 2015**

**HILLMAN, D.J.**

      Pending before the Court are cross-motions for summary judgment in this action brought under the terms of the Employee Retirement Income Security Act of 1974 (ERISA). For the reasons set forth below, Plaintiff's motion (Docket No. 42) is ***granted*** and Defendants' motion (Docket No. 40) is ***denied***. Plaintiff's long-term disability benefits are hereby reinstated and she is to be compensated for past benefits due beginning on May 25, 2012.

### Background

      The Plaintiff, Susan Young, initiated this action seeking judicial review of Aetna Life Insurance Company (Aetna)'s decision to terminate her long-term disability benefits. Plaintiff was covered under the Children's Hospital Boston Group Long Term Disability Plan (the Plan), which is governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA), 29

1

U.S.C. § 1001 *et. seq.*  Children's Hospital Boston is the plan administrator. (YP[1] at 5; Docket No.

22 at 1.)  Aetna underwrites the Plan and also serves as the claims administrator. (YP at 9; Docket

No. 22 at 1.)  The Plan provides the following "Test of Disability":

> From the date that you first become disabled and until Monthly
> Benefits are payable for 36 months, you will be deemed to be
> disabled on any day if:
>
> • you are not able to perform the **material duties** of your **own
> occupation** solely because of: disease or **injury**; and
> • your work earnings are 80% or less of your **adjusted predisability
> earnings**.
>
> After the first 36 months that any Monthly Benefit is payable during
> a period of disability, you will be deemed to be disabled on any day
> if you are not able to work at any **reasonable occupation** solely
> because of:
>
> • disease; or
> • **injury**.
>
> If your **own occupation** requires a professional or occupational
> license or certification of any kind, you will not be deemed to be
> disabled solely because of the loss of that license or certification.

(YP at 10.)

### 1. *Plaintiff's Pre-Termination Medical History*

In May of 2007, Plaintiff began working as a staff nurse at Children's Hospital Boston.

Approximately sixteen months later, on September 6, 2008, she was involved in a motor-vehicle

accident in which her vehicle was struck from behind.  She was forty-seven years old.  She did not

---

[1] "YP" refers to the "Young Policy," which is located in the beginning of the administrative record.
Plaintiff previously moved to exclude the Young Policy from the record, on the basis that this
document was not disclosed to her during the internal appeals process, despite numerous requests.
The Young Policy contains language granting Aetna discretionary authority in the claims
administration process, which in turn affects this Court's review of Aetna's decision. (YP at 62);
*see D & H Therapy Assoc., LLC v. Boston Mut. Life Ins. Co.,* 640 F.3d 27, 34 (1st Cir. 2011).
Although I found that Aetna's conduct in this regard was provocative and worthy of reproach, I
declined to exclude the Young Policy from the record. (Docket No. 30 at 4.)

return to work after the accident on account of pain in her neck, shoulder, scapula, lower back, and hip. Plaintiff made a claim for short-term disability (STD) benefits under the Plan; Aetna approved this claim and paid STD benefits to Plaintiff for twenty-six weeks. Plaintiff then applied and was approved for long-term disability (LTD) benefits under the Plan. Aetna also approved this claim, under the "own occupation" definition of disability, and began paying LTD benefits to Plaintiff beginning March 5, 2009.

In December of 2008, Plaintiff underwent surgery for a left-shoulder labral tear. (AR[2] at 1096.) Three weeks after this surgery, she was being treated with a physical therapy program but noted increasing symptoms in her lower back, right buttock, and radiating down her right leg. (AR at 932.) Plaintiff continued to report pain in her lower back and right leg seven weeks after the surgery, and again three months after the surgery, which affected her ability to walk, stand, climb stairs, sleep, and accomplish household chores. (AR at 927, 930.) In February of 2009, Plaintiff's orthopedic surgeon, Dr. Alan Solomon, completed an Attending Physician Statement (APS)[3] in which he noted that Plaintiff was capable of performing sedentary work four hours per day, three days per week. (AR at 1762.)

In March of 2009, Plaintiff saw Dr. Aneesh Singla for lower-back and leg pain, described as "aching, sharp, burning, pins/needles, shooting, pressure, electric shock type of sensation." (AR at 1634.) The pain became worse with sitting, standing, and driving. (AR at 1634.) Dr. Singla administered a transforaminal epidural steroid injection later that month, as well as an intra-articular facet nerve block in Lumbar, L3-4, L4-5, L4-S1. (AR at 1636, 1638.) Dr. Singla noted that these injections provided only minimal improvement and that the cause of Plaintiff's pain may

---

[2] "AR" refers to the primary administrative record.
[3] The APS is a form promulgated by Aetna and used for the purpose of determining eligibility for benefits.

be "multifactorial." (AR at 1641.)  Plaintiff then had a series of sacroiliac (SI) joint injections, which did improve her pain. (AR at 1642, 1644, 1646.)

On July 1, 2009, Plaintiff was involved in another motor-vehicle accident in which her car was again struck from behind.  After this accident, Plaintiff reported increased pain, numbness, weakness, and tingling in her lower back and legs. (YR at 912.)  In August of 2009, Dr. Solomon referred Plaintiff to Dr. Jane Louie, a neurologist, for her persistent back pain, right-leg weakness, right-foot numbness, and new symptoms involving her bladder. (AR at 1342.)   An MRI of Plaintiff's lumbar spine revealed no conus medullaris abnormality, no disc protrusion, and no spinal stenosis. (AR at 1342.)  There was reported T2 hyperintensity in the subcutaneous fat in the L1 to L3 level. (AR at 1342.)  Dr. Louie suspected that Plaintiff's bladder symptoms were due to a prolapsed bladder and recommended that Plaintiff see her gynecologist. (AR at 1343.)  Dr. Louie observed that Plaintiff's leg weakness was related to pain and fatigue, as her strength was normal on examination. (AR at 1344.)  Dr. Louie advised Plaintiff that the numbness in her right foot could be caused by an S1 radiculopathy.[4] (AR at 1344.)

As noted by Dr. Louie, Plaintiff suffered from stress incontinence and an overactive bladder, which conditions worsened after the motor-vehicle accidents. (AR at 1145.)  In December of 2009, she underwent surgery to repair a rectocele with prolapse. (AR at 1063.)   After this surgery, however, Plaintiff continued to report bladder spasms in direct relation to muscle spasms in her lower back. (AR at 1340.)  In late December of 2009, Dr. Solomon noted that Plaintiff's lower-back pain remained "incompletely explained." (AR at 906.)   He recommended that she

---

[4] Radiculopathy is a "[d]isorder of the spinal nerve roots." Stedman's Medical Dictionary 1484 (26th ed. 1995).

proceed toward a modified job within the nursing profession, one that would not require significant physical demands. (AR at 906.)

In February, March, April, and May of 2010, Dr. Singla administered facet block injections, in an effort to treat Plaintiff's continuing lower-back, leg, and hip pain. (AR at 1652, 1656, 1658, 1660.)  Plaintiff also continued to see Dr. Louie for her lower-back pain and continued to take Motrin, Vicodin, and Valium. (AR at 1340.)   In March of 2010, Dr. Louie noted that Plaintiff had discontinued physical therapy because it had caused her pain to worsen. (AR at 1338.) Plaintiff also reported that she could not lift anything and that she felt pain in her coccyx after prolonged sitting. (AR at 1338.)

In July of 2010, Dr. Louie noted that Plaintiff's "low back pain syndrome" was "probable lumbosacral radiculopathy." (AR at 1336.)  Once again, Dr. Louie noted that Plaintiff experienced unimproved lower-back pain, occasional shooting pains down the right buttock and right leg, and leg numbness. (AR at 1336.)  Plaintiff began taking Gabapentin for pain management, and she received cauterization of bilateral L3 to L4 nerve roots and felt significant improvement. (AR at 1336.)  She also began to see an orthopedic doctor regarding potential surgery on her right hip. (AR at 1336.)  In August of 2010, Dr. Louie noted that the initial improvements reported after the nerve cauterizations had not lasted, and all of Plaintiff's symptoms had returned with the addition of painful spasms in her right leg. (AR at 1334.)  Her bladder symptoms had significantly worsened as well. (AR at 1334.)  Plaintiff continued to take Gabapentin, Motrin, Vicodin, and Valium. (AR at 1334.)

In September of 2010, Plaintiff underwent surgery to repair a labral tear in her right hip, which was followed by physical therapy. (AR at 1018, 1278, 1284.)  Plaintiff continued to see Dr. Louie for the pain in her lower back, right buttock, and right leg. (AR at 1332.)  In October of

2010, Dr. Louie once again noted that Plaintiff's pain had "not improved tremendously" since the car accidents, despite physical therapy and treatment with Motrin and Vicodin. (AR at 1332.)  She further noted that, although Plaintiff had recently undergone hip-repair surgery, her back pain was "still debilitating." (AR at 1332.)  Dr. Louie also decreased Plaintiff's dose of Gabapentin due to its "mental dulling" effect. (AR at 1332.)

Dr. Alfred Hanmer, who had performed Plaintiff's hip surgery, noted in November of 2010 that she "had a flare-up of back discomfort," as well as pain, swelling, and color changes in her foot. (AR at 1468.)  In December of 2010, Dr. Solomon completed another APS, as well as a Capabilities and Limitations Worksheet,[5] in which he noted that Plaintiff had no present ability to work and would need to be absent from work for another ten weeks. (AR at 1672, 1674.)  Dr. Louie noted in January of 2011 that Plaintiff was participating in physical therapy due to her recent hip surgery but that her back pain was "still debilitating." (AR at 1330.)  Plaintiff was taking Gabapentin but reported that it made her feel "dopey." (AR at 1330.)  She was still experiencing painful spasms in her right leg as well as bladder spasms. (AR at 1330.)  She also had been recently hospitalized for a partial bowel obstruction and was deemed no longer able to take nonsteroidal anti-inflammatory drugs (including Motrin). (AR at 1330.)

In April of 2011, Dr. Louie completed an APS, in which she opined that Plaintiff could perform some sedentary work activity, with no lifting, pulling, or pushing, and no prolonged standing or walking. (AR at 1493.)  Dr. Louie did not opine as to how many hours per day or days per week Plaintiff could perform this type of work, noting that she presently could not resume her duties as a nurse and that she would need to be absent from work indefinitely. (AR at 1492-93.)

---

[5] The Capabilities and Limitations Worksheet is a form promulgated by Aetna, which accompanies the APS and is used to determine eligibility for benefits.

The Capabilities and Limitations Worksheet accompanying this APS was left blank. (AR at 1495.) Dr. Hanmer noted in April of 2011 that Plaintiff was taking Vicodin, Gabapentin, and Cymbalta "for back pain, which she has of the chronic nature." (AR at 1470.)

In August of 2011, Plaintiff fell and broke her wrist. (AR at 1274.) Also in August of 2011, Aetna notified Plaintiff of the upcoming change in the definition of disability pursuant to the Plan. After thirty-six months of receiving disability benefits, the Plan's definition changed from the "own occupation" standard to the "any reasonable occupation" standard. (AR at 540; YP at 10.) Plaintiff responded with a letter, in which she explained that she continued to experience back pain, which limited her ability to sit, stand, or walk for extended periods of time. (AR at 1477.) She also explained that she suffered from radiculopathy, which caused pain and numbness down her right leg and into her right foot. (AR at 1477.) She reported that she walked with an unsteady gait and would trip frequently, one of these falls resulting in her recently broken wrist. (AR at 1477.) She noted that a total right hip replacement had been scheduled for August of 2011 but had been postponed because of the injury to her wrist. (AR at 1477-78.) She was taking Gabapentin and Cymbalta, which were somewhat effective for managing her pain but often left her feeling drowsy. (AR at 1478.)

In November of 2011, Plaintiff underwent a total right hip replacement due to osteoarthritis. (AR at 1256.) In January of 2012, Dr. Louie noted that Plaintiff was undergoing physical therapy for her right hip but that the physical therapy worsened her lumbago[6] and caused further numbness in her right leg. (AR at 1247.) Dr. Louie noted that Plaintiff's bladder spasms had resolved, and that she was still taking Gabapentin even though it made her feel "dopey." (AR

---

[6] Lumbago is "[p]ain in the mid and lower back; a descriptive term not specifying cause." Stedman's Medical Dictionary 998 (26th ed. 1995).

at 1247.)  Plaintiff had stopped taking Cymbalta because it made her too sleepy; she had fallen down stairs multiple times. (AR at 1247.)  She was treating her pain with Vicodin, Valium, a Lidoderm patch, and a Transcutaneous Electrical Nerve Stimulation (TENS) unit. (AR at 1248.) Dr. Louie noted that Plaintiff had full strength in all muscle groups with initial effort, with some weakness in the right hamstring due to pain, as well as decreased sensation in two of her toes. (AR at 1248.)  Her reflexes were intact. (AR at 1248.)  Dr. Louie observed that Plaintiff's weakness was due to pain. (AR at 1248.)  Dr. Louie further noted that Plaintiff's back pain was chronic, that she had "probable right S1 lumbosacral radiculopathy," and that her symptoms were "still debilitating." (AR at 1248.)  Because Dr. Singla was no longer in the area, Dr. Louie referred Plaintiff to Dr. Janet Pearl for further interventions for her radiculopathy. (AR at 1248.)

In January of 2012, Plaintiff's physical therapist also noted that her strength was limited by her pain and that she was experiencing a flare-up of her lower back. (AR at 1003.)  Her gait was especially unsteady and she had difficulty walking up and down stairs and transferring in and out of a vehicle. (AR at 1003.)

Dr. Louie completed a Capabilities and Limitations Worksheet in February of 2012. (AR at 1411.)  She found that, during an eight-hour work day, Plaintiff could never climb, crawl, kneel, lift, pull, push, reach above her shoulder, reach forward, carry, bend, twist, stand, stoop, or walk. (AR at 1411.)  She further found that Plaintiff could perform hand grasping, firm hand grasping, and fine manipulation for only two-and-a-half to five hours out of an eight-hour day. (AR at 1411.) She found that Plaintiff could perform the activities of gross manipulation, repetitive motion, and sitting for only one-half to two-and-one-half hours out of an eight-hour day. (AR at 1411.)  Plaintiff was incapable of lifting any weight, she could not operate a motor vehicle, and she could only keep her head and neck in a static position, with no flexing or rotation. (AR at 1411.)  Dr. Louie noted

that Plaintiff's restrictions were indefinite and that she had not significantly improved despite various attempted treatments. (AR at 1411.)  In an accompanying APS, Dr. Louie noted that Plaintiff's primary diagnosis was right S1 radiculopathy and that she would need to be absent from work indefinitely. (AR at 1413-14.)

In March of 2012, Plaintiff sent another letter to Aetna, explaining that she continued to experience significant daily pain in her lower back as well as pain and numbness in her right leg and foot. (AR at 1210.)  She stated that she had difficulty standing or sitting for any extended period of time, she could not lift anything heavier than five-to-ten pounds, and that she required a cane to walk. (AR at 1210.)  She also reported that she was taking daily doses of Cymbalta and Gabapentin, both of which had sedative effects, and she was taking narcotic pain medication as needed. (AR at 1210.)  Plaintiff further explained that, on days when she had to go out for errands, physical therapy, or doctor's visits, she would be so uncomfortable by the end of the day that she would have to take additional pain medications, use ice/heat therapy, and would have to spend the following day resting at home. (AR at 1210.)

Plaintiff began seeing Dr. Janet Pearl for pain management in February of 2012. (AR at 994.)  Dr. Pearl noted Plaintiff's description of her pain as "aching, pressure, stabbing the lower back 'like an elephant's foot,' aching in right leg." (AR at 994.)  Plaintiff rated the pain as 4-5/10 on average, 4/10 at the time of the appointment, 2/10 at the least, and 10/10 at the worst. (AR at 994.)  Dr. Pearl further noted that the timing of Plaintiff's pain was continuous, that it interfered with her ability to sleep, and that it caused numbness, tingling, and burning in her right calf and foot, sometimes accompanied by weakness of the legs. (AR at 994.)  Dr. Pearl noted that Plaintiff's pain was improved by heat, ice, walking with a cane, and medications including Vicodin and Tylenol. (AR at 994.)  The pain was exacerbated by standing, bending, sitting, movement, and

walking up or down stairs. (AR at 994.)  Dr. Pearl further noted that Plaintiff's spine had been imaged in February of 2009, revealing no disc protrusion or spinal stenosis, and she had previously had a PET scan. (AR at 994.)

Regarding medications, Dr. Pearl noted that Plaintiff's dosages of Gabapentin and Cymbalta had been lowered because of over-sedation and related falls, and she was taking Vicodin occasionally. (AR at 994.)  Dr. Pearl diagnosed Plaintiff with sciatica[7] and lumbago. (AR at 990, 991, 995, 996.)  In her continuing treatment of Plaintiff in February of 2012, Dr. Pearl administered trigger point injections and a lumbar transforaminal steroid injection, noting a pre-operative diagnosis of muscle spasms and lumbar radiculopathy. (AR at 992.)  In March of 2012, Plaintiff reported that her pain had improved immediately after the injections but had then returned. (AR at 989.)  Compared to her previous visit, the pain was worse in her lower back and unchanged in her right leg. (AR at 989.)  In continuing to adjust Plaintiff's medication levels, Dr. Pearl noted that Plaintiff experienced no side effects from a dose of 20 mg of Cymbalta. (AR at 989.)  Plaintiff also reported neck pain, which had begun two months prior, described as tight and "locking." (AR at 989.)

Dr. Pearl administered trigger point injections and a lumbar medial branch block in March of 2012, and radiofrequency lesioning of the facet joint in April and May of 2012 (AR at 983, 985.)  In July of 2012, Plaintiff reported that these procedures had not offered any relief and her pain remained unchanged. (AR at 980.)  Plaintiff was taking Vicodin every morning and evening, but she decided to discontinue the Gabapentin and Cymbalta because she did not want to be taking

---

[7] Sciatica is "[p]ain in the lower back and hip radiating down the back of the thigh into the leg, initially attributed to sciatic nerve dysfunction (hence the term), but now known to usually be due to herniated lumbar disk compromising the L5 or S1 root." Stedman's Medical Dictionary 1580 (26th ed. 1995).

so many medications. (AR at 980.)  Dr. Pearl's assessments of Plaintiff's condition in July of 2012 consisted of lumbago, lumbosacral spondylosis[8] without myelopathy,[9] sciatica, and spasm of muscle. (AR at 981.)

Dr. Pearl also noted severe tenderness in Plaintiff's SI joint and suggested SI joint injections; Plaintiff underwent these injections in August of 2012. (AR at 978, 981.)  After the SI joint injections Plaintiff still experienced pain in her lower back and buttocks but her so-called "bone on bone pain" had resolved. (AR at 975.)  She had a further SI joint injection in September of 2012. (AR at 973.)  This time, her pain improved completely for several hours, followed by fifty-percent relief for one week, and then the pain returned to baseline. (AR at 970.)  Dr. Pearl refilled Plaintiff's prescription for Gabapentin. (AR at 971.) Dr. Pearl noted in September of 2012 that, overall, Plaintiff's pain had remained unchanged since she had begun treating her. (AR at 970.)

### 2. *Aetna's Medical and Vocational Reviews*

As part of its evaluation to determine whether Plaintiff could perform "any reasonable occupation," Aetna obtained an independent medical file review in March of 2012 by Dr. Leonid Topper. (AR at 1223.)  In his report, Dr. Topper summarized the treatment records from Dr. Louie and Dr. Pearl.[10] (AR at 1224-27.)  Dr. Topper attempted to contact Dr. Martin Gelman[11] and Dr.

---

[8] Spondylosis is "[a]nkylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature." Stedman's Medical Dictionary 1656 (26th ed. 1995).  "Ankylosis" is the "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint." *Id.* at 93.

[9] Myelopathy is a "[d]isorder of the spinal cord," or "[a] disease of the myelopoietic tissues." Stedman's Medical Dictionary 1166 (26th ed. 1995).

[10] At this point in time, Plaintiff had been seeing Dr. Pearl for only one month. (AR at 994.)

[11] Dr. Martin Gelman treated Plaintiff for gastrointestinal issues in December of 2010 and appears to have been her primary care provider in 2012. (AR at 1044, 1503.)

Louie for peer-to-peer consultations but was unsuccessful. (AR at 1227.)  After reviewing the

records, Dr. Topper made the following conclusions:

> [F]rom a neurological point of view, there is no evidence of any
> functional impairment. . . . [T]he medical records do not substantiate
> any neurological diagnosis and [Plaintiff's] back pain is likely to be
> of mechanical origin.  Considering the absence of a neurological
> condition, there is no support for any impairment and there is no
> need for restrictions or limitations.  [Plaintiff] is not precluded from
> working within the context of this any application review from
> 03/05/2012 to the present and forward, pending no further
> complications in the future.

(AR at 1228.)  When asked to estimate the physical demand level that Plaintiff could likely

perform, Dr. Topper opined:

> From a neurological point of view, [Plaintiff] can work at any
> physical demand level of work from 03/05/2012 through the present
> and to 03/04/2013, provided she does not experience any
> complications in the next year.  I defer the mechanical pain aspect
> of [Plaintiff's] functionality to the appropriate specialty, such as
> physical medicine and rehabilitation or orthopedics. . . .
>
> The restrictions by Dr. Louie indicate the need to avoid lifting,
> driving, pushing, pulling or standing.  These restrictions are not
> justified from a neurological point of view, but may or may not make
> sense considering [Plaintiff's] back pain.  This determination is
> deferred to the appropriate specialty.

(AR at 1228-29.)

Also in March of 2012, Aetna produced an occupational assessment, completed by

Stephanie Farland, in order to determine whether Plaintiff had transferrable skills for occupations

within a sedentary physical demand level. (AR at 404-05.)  Farland noted that Plaintiff had three

years of experience as a registered nurse and eighteen years of experience as an emergency

dispatcher. (AR at 405.)  Farland concluded that Plaintiff had transferrable skills for occupations

within a sedentary physical demand level, which also met the target wage amount for fulltime

work. (AR at 405.)  Farland did not identify any specific occupations in this report.

Because Dr. Topper had been unable to conduct a peer-to-peer review with Dr. Louie, Aetna sent Dr. Louie a peer review form and asked her to indicate whether she agreed with Dr. Topper's assessments. (AR at 1207.)  Dr. Louie disagreed with Dr. Topper's assessment that Plaintiff could work at any physical demand level; Dr. Louie indicated that Plaintiff was incapable of performing activities at the sedentary, light, and medium demand levels. (AR at 1207.)  In her comments, Dr. Louie explained: "I agree that there is no neurological deficit, which would prevent her from working, but the degree of pain is the disabling factor.  If you require a pain specialist's opinion to confirm, her pain doctor is [Dr. Pearl]." (AR at 1209.)  Aetna attempted to contact Dr. Pearl but was unsuccessful.

In March of 2012, Aetna conducted video surveillance of Plaintiff. (AR at 1232.)  In three days of surveillance, the Plaintiff was documented for only three minutes; no activity was depicted. (AR at 1233.)

In May of 2012, Aetna requested a medical file review by Dr. Malcom McPhee, a physical medicine and rehabilitation specialist, to assess the mechanical pain aspect of Plaintiff's disability. (AR at 411-12.)  Dr. McPhee reviewed records from Dr. Singla and Dr. Pearl, and assessed results from past imaging and surgeries. (AR at 1203-04.)  Dr. McPhee also contacted Dr. Louie and reported that "Dr. Louie agreed that it was reasonable that [Plaintiff] could perform a work day with a sedentary level of activity which would be mostly sitting but occasional stand/walk and change of position for a few minutes every hour." (AR at 1205.)  Dr. McPhee was unable to contact Dr. Pearl. (AR at 1205.)  Dr. McPhee indicated that, based on Plaintiff's lack of neurological abnormalities (except abnormal responses to sensory examinations), and the absence of nerve impingement, spondylosis, or disc problems, her physical conditions would not preclude her from performing any occupation that would allow mostly sitting, lifting ten pounds occasionally and

less than ten pounds frequently, with occasional standing and walking. (AR at 1205-06.)   He determined that a reasonable physical demand level for Plaintiff would be sedentary. (AR at 1206.)

Based on Dr. McPhee's conclusions, Aetna requested a transferable skills analysis (TSA) to determine whether Plaintiff was capable of performing "any reasonable occupation." (AR at 1197.)   The reviewer identified the following occupations for which Plaintiff was qualified and which met the target wage amount for fulltime work ($18.41 per hour): "Dispatcher"; "Utilization Review Coordinator"; "Hospital Admitting Clerk"; "Director Nurse's Registry"; "Medical Social Worker"; and "Nurse Case Manager." (AR at 1199.)   The reviewer did not identify any occupations meeting the target wage for part-time work ($36.82 per hour). (AR at 404.)

On May 25, 2012, Aetna notified Plaintiff that she was no longer eligible for LTD benefits. (AR at 1823.)  Aetna based its determination on medial documentation from Dr. "Singler,"[12] Dr. Solomon, Dr. Louie, Dr. Gelman, Dr. Hanmer,[13] and Dr. Pearl, as well as Dr. Topper's neurology peer review and Dr. McPhee's physical medicine & rehabilitation peer review. (AR at 1824.)

Aetna noted that Dr. Topper had found no evidence of impairment from a neurological perspective. (AR at 1824.) Aetna acknowledged that Dr. Louie had explained that pain was Plaintiff's debilitating factor and had recommended contacting Dr. Pearl. (AR at 1825.)  Because Aetna was unable to reach Dr. Pearl, it ordered the review by Dr. McPhee, who concluded that Plaintiff could perform sedentary work. (AR at 1825.)  Aetna noted that Dr. Louie had "agreed it would be reasonable for you to perform a work day with a sedentary demand level of activity which would involve mostly sitting with occasional position changes." (AR at 1825.)  Aetna then

[12] This appears to be a misspelling of Dr. Aneesh Singla's name.  Dr. Singla treated Plaintiff for approximately two years beginning in 2009 and administered various injections in an effort to reduce her pain. (AR at 1634-1668.)
[13] Dr. Hanmer performed Plaintiff's arthroscopic hip surgery in September of 2010 and her total hip replacement in November of 2011. (AR at 887, 1256.)

explained that, based on Dr. McPhee's determination, it had identified six sedentary occupations for which Plaintiff was qualified. (AR at 1825.)

### 3. *Post-Termination Medical History*

In June of 2012, Plaintiff's primary care provider, Dr. Gelman, referred her to Dr. Michael A. Marciello for evaluation and management of her chronic pain. (AR at 1044.)  Dr. Marciello noted that Plaintiff suffered from persistent lower-back pain with right leg radiculopathy. (AR at 1044.)  He noted her extensive treatment history, including spinal injections, radiofrequency, and epidural and facet blocks. (AR at 1044.)  He further noted that Plaintiff had undergone physical therapy and it had been determined "some time ago that there was no other surgical indication." (AR at 1044.)  Plaintiff was taking a variety of medications, including Valium, Fioricet, Neurontin, Vicodin, and Tramadol. (AR at 1045.)  Dr. Marciello evaluated Plaintiff's neck, trunk, upper extremities, back, legs, hips, and feet. (AR at 1045.)  He noted that her lower back had "limitations due to lumbar range of motion" and that she experienced "pain with both flexion and extension." (AR at 1045.)  He also noted "apprehension to motion" and "[t]ightness and tenderness to simple straight leg raise felt [at] the lower back." (AR at 1045.)  His overall impressions from this exam were: "Chronic back pain syndrome with question of initial injury due to SI joint and strain superimposed upon the right lumbar radiculopathy.  Secondary myofascial pain, deconditioning, and perhaps some increased tenderness following multiple spinal procedures." (AR at 1045.)  For possible treatment plans, he suggested adjustments to her chronic medications and local trigger point injections. (AR at 1045.)

Dr. Marciello saw Plaintiff again in July of 2012. (AR at 1042.)  She continued to report back pain extending into her right lower leg and foot, with neck pain as well, and some occasional dizziness and headaches. (AR at 1042.)  Plaintiff reported having had a recent electromyography

workup, which identified no active radiculopathy and no root impairment. (AR at 1043.)  She also reported new pain in her left thigh, as well as some stomach pain. (AR at 1043.)   Regarding medication, Dr. Marciello noted that Plaintiff had discontinued the Vicodin and was trying to use Tramadol infrequently, because she wanted to reduce her overall medication needs and hoped "to try to get back to some work." (AR at 1043.)  Dr. Marciello conducted a physical examination, finding, among other things, decreased lumbar range of motion, tightness in the neck, and tenderness in the back, buttocks, and hips. (AR at 1043.)  His impressions were "Multifactorial chronic discogenic pain with cervical spondylosis, myofascial pain associated with SI joint strain/sprain." (AR at 1043.)  Regarding treatment, Dr. Marciello noted that Plaintiff wanted "to try to avoid medications," and he prescribed additional spinal injections. (AR at 1043.)  He gave her Vicodin to be used when needed. (AR at 1043.)  Dr. Marciello also noted: "Do not suspect that she will be able to return to work any time quickly.  Try to indicate to her that it would also be in her best interest to look for work only once she had settled down some acuity of pain." (AR at 1043.)

After undergoing additional SI joint injections, Plaintiff returned to Dr. Marciello in August of 2012. (AR at 1040.)  Despite the injections, she still reported pain in her lower back, buttocks, and right leg, typically worse with activity. (AR at 1040.)  She also continued to report increased sensitivity in her left thigh. (AR at 1040.)  She was limited to the time she could sit and had difficulty putting her head down, lifting, carrying, and climbing stairs. (Art at 1040.)  Dr. Marciello's overall impression was "Discogenic[14] back pain.  SI joint pain.  Chronic neck cervical spondylosis and myofascial pain." (AR at 1040.)  Dr. Marciello discussed disability status with

---

[14] Discogenic denotes "a disorder originating in or from an intervertebral disk." Stedman's Medical Dictionary 491 (26th ed. 1995).

16

Plaintiff, noting that it would be "difficult for her to do anything at this time with prolonged sitting or standing." (AR at 1040.)

Plaintiff visited Dr. Marciello again in November of 2012, noting that the SI joint injections helped only briefly and did not have a long-lasting impact. (AR at 647.)  Plaintiff also reported increased neck pain, and Dr. Marciello ordered a cervical MRI. (AR at 647.)  She was taking Vicodin again, two-to-four tablets per day. (AR at 647.)  Dr. Marciello examined her neck and arms, finding adequate range of motion with some tightness. (AR at 647.)

Dr. Marciello saw Plaintiff again in January of 2013, after she had a bout of an illness that was thought to be meningitis, which required hospitalization. (AR at 645, 705.)  Dr. Marciello once again noted that Plaintiff was "quite limited to her right lower back.  She tries to use her Vicodin to help out with starting the day and getting to her errands and activities. . . . She has had some increased numbness and paresthesias to the right arm and left leg with increased activity and will modify according to her level of comfort.  Typically she was taking Vicodin twice per day and occasionally and [sic] third tablet." (AR at 645.)  Regarding Plaintiff's pain, Dr. Marciello described that "sitting is most painful compared to standing.  Any prolonged activity will soon be problematic." (AR at 645.)  Dr. Marciello also conducted a physical examination, in which he noted tenderness, increased pain with single leg support on the right, pain with lumbar flexion and extension, decreased neck rotation to the left, and nonfocal neurology in the arms. (AR at 645.)  Dr. Marciello also reviewed the recent cervical MRI, which showed "mild straightening of the lordosis[15] from C5-C7," "small disc bulging C5-6 and C6-7 with mild left sided foraminal

---

[15] Lordosis is "[a]n abnormal extension deformity; antero-posterior curvature of the spine, generally lumbar with the convexity looking anteriorly." Stedman's Medical Dictionary 996 (26th ed. 1995).

narrowing," "L3-4 and L4-5 facet arthropathy[16] with no central stenosis," "[history] of bulging and annular tear L4-5 to the right," and "facet arthropathy seen at L5-S1." (AR at 645.)  Dr. Marciello's overall impressions as of January of 2013 were: "Chronic back pain secondary to SI joint dysfunction, SI joint sprain/strain, discogenic and facet mechanical lower back pain.  Cervical spondylosis with intermittent nerve root irritation to the left." (AR at 645.)  Plaintiff remained in daily chronic pain, and Dr. Marciello suggested increasing the Vicodin and adding a long-acting opioid at night. (AR at 645.)

### 4.  *The Appeal Process*

In November of 2012, Plaintiff appealed Aetna's termination of her benefits. (AR at 880.) She later submitted medical records and narratives from Active Physical Therapy, Bay State Physical Therapy, Dr. Solomon, Dr. Pearl, Dr. Marciello, Dr. Michael Donovan,[17] and Dr. Xiaojing Tao,[18] as well as affidavits by Plaintiff and her husband.  She also submitted a vocational assessment report completed by James T. Parker, CVRP, CRC, in February of 2013.

In a letter dated February 13, 2013, Dr. Louie described Plaintiff's condition as of August of 2012, which was the last time she had treated Plaintiff. (AR at 633.)  Dr. Louie noted Plaintiff had reported lower back pain, which radiated down her right leg and foot, as well as "burning paresthesias in the lateral aspect of the foot, consistent with the right S1 dermatome." (AR at 633.) Dr. Louie noted that Plaintiff had "improved minimally with nerve cauterization, Lidoderm patches, Gabapentin, and a TENS unit, but her symptoms are still debilitating." (AR at 633.)  Dr. Louie further noted that "recent trigger point injections have greatly helped her pain,"

---

[16] Arthropathy is "[a]ny disease affecting a joint." Stedman's Medical Dictionary 150 (26th ed. 1995).

[17] Dr. Donovan was Plaintiff's urologist. (AR at 785, 1054, 1060, 1145.)

[18] Dr. Tao was Plaintiff's gynecologist. (AR at 1057, 1062, 1065.)

that Plaintiff had eliminated some medications, and that her pain "had become more tolerable on the [G]abapentin and Vicodin without excessive sedation." (AR at 633.)  Regarding potential employment, Dr. Louie wrote that Plaintiff should not lift anything greater than ten pounds, and that she could not stand for more than twenty minutes at a time. (AR at 633.)  Dr. Louie further noted that, while her "right S1 nerve root irritation would not prohibit her from obtaining a sedentary job, . . . she has multiple other pain issues, which would also make a sedentary job difficult." (AR at 633.)  Dr. Louie deferred to Plaintiff's pain specialist and psychiatrist "to assess her disability from a pain perspective." (AR at 633.)

Dr. Marciello wrote a letter dated January 2, 2013, as the physician who had been medically managing her persistent pain since 2012. (AR at 622.)  He opined:

> It is my medical opinion, that [Plaintiff] is totally and permanently impaired and therefore disabled from all gainful employment.  It is my medical opinion that she not only cannot carry out the duties of her training of an ICU nurse, but in my opinion she is unable to carry out the duties of any sedentary office position.

(AR at 622.)  He noted that, although her "back and leg pains might be determined to be non-neurological," the disabling diagnosis was "persistence of pain across the muscles of the buttocks and lower back, as well as having a SI joint sprain/strain from the first accident and probably reoccurring in the second accident," and "findings of a myofascial referred pain into the right leg." (AR at 622-23.)

Dr. Marciello agreed with Dr. Topper that "there is no objective neurological injury," but "in relation to pain management and pain syndrome, there is not only referred right leg pain, but also myofascial referred musculoskeletal pain that results in pain with prolonged standing, prolonged sitting, bending, stooping, or performing any repetitive activity requiring movement across the lower back and pelvis." (AR at 623.)  He further noted that, "[b]ecause of the numerous

procedures, and duration of time since her injury, she has also significantly deconditioned and has become weak in these muscle areas which will preclude her from improving substantially." (AR at 623.)  Dr. Marciello also described the impact of Plaintiff's hip and gynecological surgeries on her ability to stay in a seated position and noted that repetitive use of her arm would likely aggravate her shoulders and neck. (AR at 623.)

Additionally, Dr. Marciello addressed the impact of Plaintiff's medications on her ability to work:

> [I]n order to accommodate the daily and persistent pain of her pelvis, lower back, right hip and groin, and right leg, [Plaintiff] requires daily medications including neuropathic medicines such as [G]abapentin which is likely to result in decreased concentration, decreased memory, and sedation.  Furthermore, the pain results in her frequently requiring opioid pain medications including [T]ramadol and Vicodin which again may impair her judgment and functional tasks.  Therefore, in my opinion, if she had to carry out full-time work, implying 8 hour work day, it is more likely than not that her pain levels will increase causing her to use more medications, and possibly impairing her function and mental status capacity even further.

(AR at 623.)  Dr. Marciello further noted that the nature of Plaintiff's musculoskeletal pain and weakness resulted in frequent flares of pain, which would cause her attendance in a workplace to be unreliable. (AR at 623.)  In conclusion, Dr. Marciello explained:

> [Plaintiff] is at a medical end point.  She has been treated by a number of medical providers.  She has undergone numerous procedures, trials of medications, physical therapy, an extensive period of relative rest, all of which have been unsuccessful in managing her pain or improving her function.  It is, therefore, in my opinion, that [Plaintiff] remains totally disabled from all gainful employment including sedentary work.

(AR at 624.)

As part of her appeal, Plaintiff also submitted a vocational assessment conducted by James T. Parker, CVRP, CRC, in February of 2013. (AR at 634-42.)  Parker reviewed Plaintiff's medical

records, with special emphasis on her most recent treating physicians, Drs. Louie, Pearl, and Marciello. (AR at 635-37.)  Parker opined that Plaintiff was not capable of performing any work, part-time or fulltime, at any exertion level. (AR at 640.)  He noted Plaintiff's documented inability to stand or sit for long periods of time and found that the record established that Plaintiff was unable to stand for two hours in an eight-hour work day, which is the minimum amount of standing required for sedentary work. (AR at 640.)  He also noted that because she required the assistance of a cane, she could not perform tasks with both of her hands while in a standing or walking position, a skill that is necessary to conduct sedentary work at an acceptable pace. (AR at 640.)  Parker further noted, the record showed that sitting was the most difficult position for Plaintiff to maintain, and sedentary work requires the ability to sit for six hours in an eight-hour workday. (AR at 641.)

Parker also noted Plaintiff's use of pain medications, with their side effects of sedation and decreased ability to concentrate, and he mentioned Dr. Marciello's opinion that if Plaintiff were to return to work she would need to increase her usage of these medications, which would in turn decrease her mental capacity. (AR at 641.)  Parker noted Plaintiff's substantial impairments in performing activities of daily living, which required her to self-pace and limit the tasks performed due to early fatigue and pain. (AR at 641.)  Parker noted that "the inability to sustain routine non-demanding household tasks is a strong indicator of the inability to sustain any work on a regular and consistent basis." (AR at 641.)  Parker concluded, "[b]ased on the limitations established by [Plaintiff's] physicians, she is totally disabled from all employment," and she would remain so for the foreseeable future. (AR at 642.)

Plaintiff also submitted an affidavit with her appeal, in which she once again described how her life had been affected by her injuries. (AR at 1161-64.)  She described continuous,

moderate-to-severe pain in her lower back, radiating down her right leg, with numbness in her right foot. (AR at 1163.)  She explained that her gait is affected and she cannot "not stand or sit in one place for an extended period of time without great discomfort and increasing pain." (AR at 1163.)  Even on good days, she has difficulty getting through daily tasks and errands, and her nights are usually spent in a recliner with ice packs on her back, leg, and foot. (AR at 1163.)  She takes Vicodin or Tylenol as needed, to get through her errands or to get comfortable at the end of the day. (AR at 1164.)  On bad days, she is unable to do errands and alternates between walking, sitting, and laying on her side. (AR at 1164.)  On these days she takes Vicodin in the morning, and spends the evening with ice packs from her lower back all the way down her right leg, feeling like her leg "is in a vice and [her] tailbone feels like it is coming through [her] bottom." (AR at 1164.)  She experiences pain when sitting for extended periods of time. (AR at 1164.)  Between the discomfort and the frequent need to readjust or stand up, her ability to concentrate is severely affected. (AR at 1164.)  She continues to take daily doses of Gabapentin, in addition to Vicodin and Tylenol, and her medications affect her ability to focus and concentrate. (AR at 1164.)

As part of its internal appeal review process, in June of 2013 Aetna obtained an independent medical file review by Dr. Frank Polanco, a specialist in Occupational Medicine and Pain Medicine. (AR at 602-09.)  After reviewing Plaintiff's medical records, Dr. Polanco concluded that Plaintiff was capable of performing work at a sedentary level. (AR at 606.)  Dr. Polanco found that although Plaintiff was limited by her chronic lower-back and hip conditions, there were no limitations on her upper or lower extremities. (AR at 607.)  Dr. Polanco entirely rejected Dr. Marciello's opinion because Dr. Marciello did "not provide any clinical findings to support his opinions, no measures of strength, range of motion, or endurance or movement capacity." (AR at 607.)

Dr. Polanco also found "no findings in the clinical reports that [Plaintiff] is cognitively affected by her chronic medication use." (AR at 608.)  He noted generally that "[c]hronic pain patients typically adjust and develop tolerance to the use of the chronic opioids and other medications." (AR at 608.)  He found "[n]o adverse medication side effects affecting functionality reflected in the medical records." (AR at 608.)  Regarding Parker's vocational opinion that Plaintiff was totally disabled, Dr. Polanco disagreed on the ground that Parker's opinion was based on Dr. Marciello's opinion, which was not supported by clinical findings. (AR at 608.)

Dr. Polanco initially found that Plaintiff was limited to lifting ten pounds or less, that she could walk, stand, or sit for no more than one third of the day (approximately 2.6 hours out of an eight-hour day), and that she had to be able to change postures every forty-five minutes. (AR at 606.)  After he issued his report, upon Aetna's request for clarification, he submitted the following addendum, altering his assessment of Plaintiff's functionality: "[Plaintiff] would be capable of sitting, standing, and/or walking for no more than 45 minutes at a time (each).  This refers to full-time 8 hour day work capacity.  Her deconditioning does not prevent full-time work, it contributes to her decreased functional capacity.  It is only reversible with activity."[19] (AR at 609.)

In a letter dated June 24, 2013, Aetna upheld its decision to terminate Plaintiff's benefits. (AR at 1829.)  Aetna noted that Plaintiff is "functionally limited by various medical conditions," primarily "by her low back condition, total hip replacement, neck condition and general deconditioning." (AR at 1830.)  Aetna found that these conditions limit Plaintiff's capacity to kneel, crawl, lift, walk, stand, and climb. (AR at 1831.)  Notably, Aetna did not include sitting in this list.  Aetna found that these restrictions were supported by "clinical findings of soft tissue

---

[19] This addendum eliminated the limitation of sitting and standing to one-third of the day; this limitation would not have been consistent with the capacity to perform sedentary work, which requires the ability to sit for six hours out of an eight-hour day. (AR at 641.)

findings in the neck and back, with limitation of motion primarily in her back." (AR at 1831.) Aetna also noted "diagnostic findings of degenerative spine disease, operative and clinical reports." (AR 1831.)  Aetna further found that, because Plaintiff is neurologically intact and her motor strength is intact, she has no limitations in her upper or lower extremities. (AR at 1831.) Aetna concluded that Plaintiff can sit, stand, and/or walk for no more than forty-five minutes at a time (each) in an eight-hour workday, and that her deconditioning does not preclude her from working. (AR at 1831.)  The language used in Aetna's final termination letter mirrors the findings in Dr. Polanco's report.

In response to Aetna's final decision, Plaintiff initiated the instant lawsuit against Aetna and the Plan (collectively, Defendants), seeking judicial review pursuant to 29 U.S.C. § 1132(e). Plaintiff seeks reinstatement of her LTD benefits, compensation for unpaid benefits beginning May 25, 2012, and attorneys' fees and costs.  On June 12, 2015, the parties filed cross-motions for summary judgment.

## Discussion

### 1.  *Standard of Review*

"Cases that concern benefit determinations under an ERISA plan . . . are not typical cases when it comes to summary judgment." *D & H Therapy Assoc., LLC v. Boston Mut. Life Ins. Co.,* 640 F.3d 27, 34 (1st Cir. 2011).  A motion for summary judgment is merely the procedural vehicle by which the denial of a benefits claim is tested under ERISA. *See Orndorf v. Paul Revere Life Ins. Co.,* 404 F.3d 510, 517 (1st Cir. 2005).  "[T]he district court sits more as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon, Co.,* 315 F.3d 11, 18 (1st Cir. 2002).  Accordingly, in such cases "the non-moving party

is not entitled to the usual inferences in its favor." *D & H Therapy Assoc., LLC*, 640 F.3d at 34

(quoting *Cusson v. Liberty Life Assurance Co. of Boston*, 592 F.3d 215, 224 (1st Cir. 2010))

(citation omitted).

"When an ERISA plan gives an administrator discretionary authority to determine

eligibility for benefits or construe the plan's terms, the district court must uphold the

administrator's decision unless it is 'arbitrary, capricious, or an abuse of discretion.'" *Id.* (quoting

*Cusson*, 592 F.3d at 224) (citation omitted). "[F]or purposes of reviewing benefit determinations

by an ERISA plan administrator, the arbitrary and capricious standard is functionally equivalent

to the abuse of discretion standard." *Id.* at 34 n.5 (quoting *Wright v. R.R. Donnelley & Sons Grp.*

*Benefits Plan,* 402 F.3d 67, 74 n.3 (1st Cir. 2005)). Thus, the First Circuit Court of Appeals has

elected to describe this standard simply as "abuse of discretion" review. *Id.* Here, all parties agree

that Aetna had discretionary authority under the terms of the Plan. Therefore, the abuse of

discretion standard applies to this case.

Under the applicable standard of review, the decision of the plan administrator will be

upheld if it "is plausible in light of the record as a whole," meaning, "supported by substantial

evidence in the record." *Leahy*, 315 F.3d at 17 (internal citations omitted). "Substantial evidence

. . . means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not

disappear merely by reason of contradictory evidence. . . . [The] question [is] not which side [the

court] believe[s] is right, but whether [the administrator] had substantial evidentiary grounds for a

reasonable decision in its favor." *Doyle v. Paul Revere Life Ins. Co.,* 144 F.3d 181, 184 (1st Cir.

1998) (citations omitted). "In making this determination, we look to the record as a whole." *Cook*

*v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 19 (1st Cir. 2003). "It is the responsibility of the

[a]dministrator [and not the court] to weigh conflicting evidence." *Vlass v. Raytheon Employees*

*Disability Trust,* 244 F.3d 27, 32 (1st Cir. 2001).   However, an administrator's faulty reasoning and mischaracterization of the evidence will not survive "arbitrary and capricious" review simply because isolated evidence in the record might support the administrator's decision. *Buffonge v. Prudential Ins. Co. of America,* 426 F.3d 20, 30-31 (1st Cir. 2005).

### 2.   *The Parties' Arguments*

Plaintiff makes several related arguments in support of her motion for summary judgment. First, she argues that Aetna's vocational review was flawed and insufficient.   She asserts that the initial TSA, conducted in May of 2012, relied solely on the restrictions imposed by Dr. McPhee, while ignoring the medical records from Plaintiff's treatment providers.   Plaintiff argues that Aetna failed to evaluate whether she was able to perform the material duties of the sedentary occupations it identified.   Plaintiff further notes that Aetna did not conduct a comprehensive vocational analysis after the submission of Plaintiff's appeal, and that Aetna ignored the vocational review conducted by Parker.

Next, Plaintiff argues that Aetna was unfairly selective in its review of the medical evidence and ignored evidence of her chronic pain.   Aetna's decision was purportedly based on a lack of clinical findings to explain Plaintiff's symptoms; Plaintiff asserts that pain is always self-reported, but this does not mean that it can be ignored.   Plaintiff further argues that Aetna ignored the evidence of her functional limitations, as explained in Parker's vocational assessment.   Parker was the only vocational expert throughout the claims process who reviewed Plaintiff's medical records.   Aetna's vocational review, in comparison, was based entirely on Dr. McPhee's conclusion that Plaintiff could perform sedentary work.   Plaintiff also asserts that Aetna erred by relying on Dr. Polanco's generalized assessments of how chronic pain patients typically adjust to pain medication, while ignoring the effects of such medications on Plaintiff specifically.   In

addition, Plaintiff asserts that Dr. Polanco failed to recognize the potential risk of harm to her upper extremities.

Plaintiff also argues that Aetna unreasonably evaluated her medical conditions in isolation from one another and failed to consider the constellation of symptoms from all of her various ailments. She claims that her disability stems from the intersection of the symptoms of her back condition, hip injuries, upper body injuries, gynecological issues, and the respective treatments for each of those conditions. Aetna, she contends, relied on Dr. Polanco's assessment, which focused solely on Plaintiff's lower-back problems and ignored the opinions from her treating physicians regarding her other conditions. Plaintiff also argues that Aetna erred by ignoring the surveillance video, which showed three days of inactivity.

Finally, Plaintiff argues that Aetna had a structural conflict of interest in the review of Plaintiff's claim and that this conflict should be factored into this Court's review of Aetna's decision. Plaintiff asserts that Aetna's conflict of interest manifested itself in its failure to provide her with a full and fair review of her claim.

In response, Defendants claim that Aetna did not ignore Plaintiff's subjective complaints of pain but instead sought the opinions of multiple medical professionals and looked at medical evidence in order to determine whether these complaints correlated with the medical records. Defendants claim that no medical opinions or information were ignored. In support, they outline the process undertaken in the course of reviewing Plaintiff's claim, noting that the reviewing physicians were unable to contact all of Plaintiff's treating physicians for peer-to-peer consultations. Aetna asserts that its decision to terminate Plaintiff's benefits was based on the record evidence, including: records submitted by Plaintiff; the vocational assessment; the medical reviews; Dr. Louie's agreement that Plaintiff was capable of sedentary work; and the lack of any

definitive evidence or objections by Plaintiff's other treating physicians.  Defendants also argue

that Dr. Polanco reviewed the surveillance video and that the findings of this video are consistent

with the determination that Plaintiff should be limited to sedentary work.  Defendants assert that

there is no structural conflict of interest in this case because Aetna is the claims administrator and

Children's Hospital Boston is the plan administrator.

*3.  Analysis*

Although the standard of review of Aetna's decision is deferential, "there is a sharp

distinction between deferential review and no review at all." *Colby v. Union Sec. Ins. Co. & Mgmt.*

*Co. for Merrimack Anesthesia Associates Long Term Disability Plan*, 705 F.3d 58, 62 (1st Cir.

2013). ERISA mandates that "every employee benefit plan shall . . . afford a reasonable

opportunity to any participant whose claim for benefits has been denied for a full and fair review

by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133.  The

phrase "full and fair review" has been interpreted "to protect a plan participant from arbitrary or

unprincipled decision-making." *Buffonge*, 426 F.3d at 30 (quoting *Grossmuller v. Int'l Union,*

*United Auto., Aerospace & Agr. Implement Workers of Am., UAW, Local 813*, 715 F.2d 853, 857

(3d Cir. 1983)).  After thoroughly examining the voluminous administrative record, I find that

Aetna abused its discretion and did not base its decision on substantial evidence.  Aetna's

determination that Plaintiff can function in a fulltime capacity as a dispatcher, a hospital admitting

clerk, or a medical social worker—to use a few of Aetna's examples—is simply not plausible, nor

supported by the record.

This is not a case in which the reviewing doctors agree on the claimant's diagnosis but

disagree on the effect of that diagnosis on the claimant's ability to work. *See Cusson*, 592 F.3d at

227.  Nor is this a case in which there was conflicting medical evidence regarding the extent of the

claimant's injuries. *See Leahy*, 315 F.3d at 19.  This is also not a case in which the claimant had failed to comply with assessments or was thought to have exaggerated her reported symptoms. *See Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004).  Rather, this is a case in which the claims administrator failed to provide reasoned support for its conclusions and ignored credible evidence of disability, choosing instead to rely selectively on discrete findings, which appear reasonable when sewn together to form a termination letter, but are highly questionable when viewed in the context of the entire record.

Plaintiff's medical records reveal that, from the date of her second car accident in 2009 until the final termination of her benefits in 2013, she suffered consistent, intractable pain in her lower back, buttocks, and right leg.  As explained in detail above, Plaintiff saw numerous doctors for this pain, including Dr. Solomon, Dr. Singla, Dr. Gelman, Dr. Louie, Dr. Pearl, and Dr. Marciello.  Through these physicians she faithfully pursued various treatments, including physical therapy, injections, surgery, and medication.  Despite these treatments, there is no evidence in the medical records that her pain improved significantly for more than a few days or a week at a time.

I acknowledge that I "have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician." *Buffonge*, 426 F.3d at 27 (quoting *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003)).  However, I am also aware that administrators "'may not *arbitrarily* refuse to credit' the opinion of a claimant's treating physician." *Ortega-Candelaria v. Johnson & Johnson*, 755 F.3d 13, 25 (1st Cir. 2014) (citing *Black & Decker,* 538 U.S. at 834 (emphasis added)).  Fundamentally, "[a]n administrator's decision must be 'reasoned' to survive 'arbitrary and capricious' review." *Buffonge*, 426 F.3d at 30 (quoting *Gannon*, 360 F.3d at 213).  In this instance, the treating physicians' records formed a unified basis for Plaintiff's claimed disability, which consisted of chronic, debilitating pain,

stemming from a conglomeration of potential sources, beginning after the first motor-vehicle accident in 2008 and worsening after the second accident in 2009. Instead of confronting these records, Aetna has pieced together snippets of opinions from selected reports, in order to create an illusion of competing medical evidence.

A.   *Aetna's Independent File Review Reports*

Although Aetna claims to have reviewed the entire volume of medical records in this case, its finding of a lack of medical evidence to support Plaintiff's disability relied mainly on the reports of Dr. Topper, Dr. McPhee, and Dr. Polanco. These reports are the only parts of the record that indicate that the Plaintiff is able to perform fulltime sedentary work. I shall address each of these reports in turn and discuss why, in the context of this record, they do not constitute "substantial evidentiary grounds for a reasonable decision" to deny Plaintiff's LTD benefits. *See Ortega-Candelaria*, 755 F.3d at 20.

i.   *Dr. Topper's Report*

First, to the extent that Aetna relied on Dr. Topper's report to contradict the evidence of Plaintiff's chronic pain, this reliance was unreasonable. Dr. Topper's report makes clear that he approached Plaintiff's limitations from a neurological perspective only, and after reviewing the records he found no neurological conditions that would cause a functional impairment. He specifically noted, however, that other restrictions may be necessary from a pain perspective, and he deferred the "mechanical pain aspect" of Plaintiff's condition to the appropriate specialty. (AR at 1228-29.) Thus, Dr. Topper did not find that Plaintiff could function despite her pain; he made *no* findings regarding the impact of Plaintiff's pain on her ability to function.

Unlike Drs. McPhee and Polanco, Dr. Topper's report is not inconsistent with the other medical records. The records from Dr. Louie, Dr. Solomon, Dr. Pearl, and Dr. Marciello show

that the cause of Plaintiff's chronic lower-back and leg pain has remained incompletely explained, despite numerous diagnostic procedures and many attempted treatments.  Indeed, the inability of any of these physicians to precisely pinpoint the cause of Plaintiff's pain may be one reason why she has not yet found an effective treatment.  To complicate matters further, Plaintiff has an extensive and complicated medical history, including endometriosis, diverticulitis, colitis, asthma, hypertension, osteoarthritis, osteopenia, small bowel obstructions, migraines, lysis of adhesions, appendectomy, cholecystectomy, and nephrolithiasis. [20] (AR at 994, 1518.)

Plaintiff's pain has been attributed to various potential causes and has been described in divers ways throughout the medial records, including: "S1 radiculopathy"; "probable lumbosacral radiculopathy"; "sciatica and lumbago"; "muscle spasms and lumbar radiculopathy"; "lumbosacral spondylosis without myelopathy"; "right leg radiculopathy"; "Discogenic back pain"; "SI joint pain"; "neck cervical spondylosis"; "myofascial referred musculoskeletal pain"; "mild straightening of the lordosis from C5-C7"; "small disc bulging C5-6 and C6-7 with mild left sided foraminal narrowing"; "L3-4 and L4-5 facet arthropathy with no central stenosis"; "facet arthropathy seen at L5-S1"; "SI joint dysfunction"; "SI joint sprain/strain"; "discogenic and facet mechanical lower back pain"; "Cervical spondylosis with intermittent nerve root irritation to the left"; "myofascial referred pain into the right leg"; and "L5-S2 right small disc protrusion." (AR 622-23, 645, 981, 992, 995, 996, 1040, 1044, 1336, 1344, 1634-1668.)

The records show that these diagnoses have evolved over the years, depending on the treatment modality being pursued at any particular time.  Most of the diagnoses are mechanical in nature; Dr. Louie and Dr. Marciello each confirmed during the appeal process that Plaintiff had

---

[20] As of February of 2012, Plaintiff had undergone a total of thirteen abdominal surgeries. (AR at 994.)

not been diagnosed with any certain neurological condition. (AR at 623, 1207). However, the fact that Plaintiff's pain remains incompletely explained—and is not decidedly neurological—does not render her symptoms any less severe. The record reflects that she has suffered from consistent, chronic pain since at least 2009, which limits her ability to sit, stand, and ambulate. Dr. Topper's report simply does not address this issue.

ii.     *Dr. McPhee's Report*

Second, it was not reasonable for Aetna to rely on Dr. McPhee's characterization of Dr. Louie's opinion in lieu of Dr. Louie's own self-reported records. Despite the fact that Dr. McPhee was brought into this case as a rehabilitation specialist, to fill the void left by Plaintiff's unresponsive treating physicians, Dr. McPhee's report does not describe Plaintiff's history of persistent chronic pain. Instead, Dr. McPhee relied on the lack of a concretely diagnosed neurological abnormality, nerve impingement, spondylosis, or disc problem, in order to reach the conclusion that Plaintiff could perform sedentary work. Although Dr. McPhee reviewed Dr. Louie's records, he did not consider them particularly relevant. Instead, he relied on a phone call to Dr. Louie, during which Dr. Louie apparently agreed that Plaintiff could "perform a work day with a sedentary level of activity." (AR at 1205.) This statement, taken in isolation, was used twice in Aetna's initial termination letter as a rationale for denying Plaintiff's LTD benefits. (AR at 1825.)

It is unclear from this one totem-pole hearsay statement, as reported by Dr. McPhee, whether Dr. Louie actually agreed with Dr. McPhee's assessment of Plaintiff's condition. Dr. McPhee's wording does not specify whether Dr. Louie agreed that Plaintiff could work permanently in a fulltime sedentary job, whether she could work part-time, or for one day only; or, for that matter, whether this ability was based on a neurological perspective or a mechanical

pain perspective.  Indeed, just three months prior to Dr. McPhee's report, Dr. Louie had completed an APS and Capabilities and Limitations Worksheet in which she had opined that Plaintiff could *not* work fulltime in a sedentary capacity.  I find that it was arbitrary for Aetna to rely on one second-hand statement, when it had at its fingertips the entire record of Dr. Louie's treatment of Plaintiff.  Aetna's willingness to prioritize Dr. McPhee's unspecific characterization of Dr. Louie's opinion over direct evidence produced by Dr. Louie speaks to the overall fairness of Aetna's decision-making process.[21] *See Buffonge*, 426 F.3d at 30.

Dr. McPhee's conclusions are also questionable in light of the other records upon which he supposedly based his opinion.  Dr. McPhee's list of relevant medical records consists mainly of notes from Dr. Singla's treatment of Plaintiff from March of 2009 until December of 2010.  During this period, spanning nearly two years, Dr. Singla administered numerous injections to treat Plaintiff's pain and listed her primary diagnosis as "L5-S2 right small disc protrusion," with various secondary diagnoses. (AR 1634-1668.)  Although the source of Plaintiff's pain was never fully identified, its presence was constant and persistent.  Dr. Singla consistently reported, from March of 2009 until December of 2010, that the Plaintiff's lower-back and leg pain was significant, and was worsened by sustained sitting and standing. (AR 1634, 1636, 1638, 1640, 1642, 1644, 1646, 1648, 1650, 1652, 1654, 1656, 1658, 1660, 1663, 1665, 1668.)  Significantly, Dr. McPhee acknowledged these records but did not explain why he discredited them or how, in his opinion,

---

[21] The unorganized state of the voluminous administrative record submitted to this Court also sheds light on the level of care given by Aetna in undertaking the review of Plaintiff's claim.  The record is more than 1800 pages in length and was submitted to this court with no appendix, table of contents, index, or other organizational key.  The documents are bound into two volumes but are arranged in no discernable order within these volumes.  The fourteen exhibits that Plaintiff submitted during the internal appeals process are dispersed haphazardly throughout the record, and many are unlabeled.  Some documents are duplicated many times throughout the two volumes, while others appear just once.  It is difficult to imagine how one could thoroughly review each of these important records and then compile them in such a disorganized manner.

Plaintiff would be able to maintain fulltime sedentary work despite her documented, consistent pain.

### iii.   Dr. Polanco's Report

Third, Aetna's final determination letter makes clear that Aetna relied heavily on Dr. Polanco's report.  Aetna's specific findings regarding the number of hours during which Plaintiff is capable of sitting and standing in a day, as well as the note regarding her deconditioning, seem to be cut and pasted from Dr. Polanco's findings. (AR at 609, 1831.)  Dr. Polanco's opinion, however, was not reliable because he arbitrarily dismissed the findings by Dr. Marciello and the vocational assessment conducted by Parker.

Dr. Polanco rejected Dr. Marciello's findings for the following reasons: "Dr. Marciello does not provide any clinical findings to support his opinions, no measures of strength, range of motion or endurance or movement capacity.  Therefore, these restrictions are not supported." (AR at 607.)  At first blush, this statement may appear to provide a sound reason for Dr. Polanco's decision to discount the findings of Dr. Marciello.  When investigated in the context of the medical records, however, it becomes clear that the statement is not credible.

To the extent that Dr. Polanco's statement was intended to mean that Dr. Marciello had not physically examined Plaintiff, this would be contrary to the medical records.  Each time Dr. Marciello saw Plaintiff as a patient, he examined her and reported the various results of these examinations in his notes, which included tenderness, tightness, and limited range of movement in her back, legs, hips, neck, and arms.  Alternatively, to the extent that this statement by Dr. Polanco was meant to explain that Plaintiff's body could physically maintain a seated posture for forty-five minutes out of every hour, this finding—like Dr. Topper's findings—ignores the actual issue in this case, which is Plaintiff's *pain and discomfort* when maintaining a seated or standing

position.  However Dr. Polanco's statement is construed, it does not provide a sound rationale for the wholesale rejection of the records and opinions of one of Plaintiff's primary and most recent treating physicians.

Moreover, Dr. Polanco's finding regarding the "lack of clinical evidence" underlying Dr. Marciello's opinion appears to have been crucially important in Aetna's decision-making process.  Not only did Aetna use this finding to discredit Dr. Marciello's records—including his opinion that Plaintiff could not perform fulltime sedentary work due to her chronic pain—but the finding also appears to have been used as the sole basis for discounting Parker's vocational assessment.

Aetna's final termination letter mentions Parker's report but does not explain why Parker's findings were rejected.  Dr. Polanco's report, however, addressed Parker's assessment and rejected it because Parker had allegedly based his opinions primarily on Dr. Marciello's findings, which, according to Dr. Polanco, were not supported by clinical evidence.  As explained above, Dr. Marciello's report was based on his clinical findings, especially with regard to the reports of the extent of Plaintiff's chronic pain.  Additionally, in producing his report—which was the only vocational assessment conducted on the basis of medical records—Parker reviewed all of Plaintiff's records, placing special emphasis on those from Drs. Louie, Pearl, and Marciello, because they were her treating physicians.  It was not reasonable, on these grounds, for Aetna to rely on Dr. Polanco's summary dismissal of all findings of one of Plaintiff's primary treating physicians, as well as the findings of the only independent vocational assessment conducted in this case.  This reliance constitutes an abuse of discretion.

B. *The Effect of Plaintiff's Medication Usage*

Additionally, Aetna abused its discretion by failing to address the impact of Plaintiff's chronic medication usage on her ability to perform a fulltime sedentary occupation at the requisite wage rate. This issue was prominently mentioned in Dr. Marciello's records as well as in Parker's assessment; it was summarily dismissed by Dr. Polanco, who found "no findings in the clinical reports that [Plaintiff] is cognitively affected by her chronic medication usage." (AR at 608.) This statement is inaccurate when compared with the medical records. The records from Dr. Louie, Dr. Pearl, and Dr. Marciello reveal that Plaintiff experienced sedation, "dopiness," and "mental dulling" while taking Gabapentin and Cymbalta. The office notes from these physicians disclose that Plaintiff continually struggled with the dosages, ceased taking these medications at times because of the side effects, and *suffered falls as a result of over-sedation*. (AR at 623, 980, 989, 994, 1164, 2012, 1330, 1332) (emphasis supplied.) Parker addressed this issue in his vocation assessment, noting that Plaintiff's ability to function in a workplace would be negatively impacted by these medications because they cause decreased ability to concentrate and impaired memory. (AR at 641.) He also noted that this problem would worsen if Plaintiff needed to increase her dosages in order to cope with a higher level of pain caused by a higher level of activity. (AR at 641.)

The medication issue is a critical component to the determination of whether Plaintiff is capable of performing "any reasonable occupation" at the target wage rate. Aetna conducted one TSA in May of 2012; this assessment was based entirely on Dr. McPhee's findings that Plaintiff could perform any sedentary job for which she was qualified.[22] Even assuming arguendo that

---

[22] Aetna also conducted an occupational assessment in March of 2012, but it focused solely on whether Plaintiff's education, employment history, and occupational skills would qualify her for occupations within the sedentary physical demand level.

Aetna had relied on accurate sources to determine that Plaintiff could perform fulltime sedentary work, Aetna made no finding as to whether she would be *mentally* qualified for such work, considering her significant medication requirements.  This is not a hypothetical inquiry; chronic pain requires chronic medication, and this medication would have to be increased if Plaintiff spent more time doing activities that exacerbated her pain.  Aetna's naked reliance on Dr. Polanco's dismissal of this issue constitutes an abuse of discretion.

C.  *The APS and Capabilities and Limitations Worksheets*

Aetna also abused its discretion by dismissing without explanation four APS and Capabilities and Limitations Worksheets, which showed that, from February of 2009 until at least February of 2012, Plaintiff could not perform fulltime sedentary work.  In February of 2009, Dr. Solomon determined that Plaintiff could perform sedentary work for a few hours per day, three days per week. (AR at 1762.)  In December of 2010, Dr. Solomon found that Plaintiff had no present ability to work. (AR at 1672.)  In April of 2011, Dr. Louie did not state any number of hours during which Plaintiff could sustain sedentary work. (AR at 1492.)  In February of 2012, Dr. Louie found that Plaintiff could sit for only one half to two-and-one-half hours out of an eight hour day, that she could never stand, and that these restrictions would last indefinitely. (AR at 1411.)  These findings directly contradict Aetna's determination that Plaintiff could sit for six hours and stand for two hours in an eight hour day, every day, five days per week.  Aetna has not addressed this conflict, nor has it revealed its rationale for discrediting these reports, choosing instead to "cherry pick" those parts of the record that support its position.

D.  *Structural Conflict of Interest*

The Supreme Court has held that, in the context of ERISA, when an entity both pays out benefits under a disability plan and administrates claims under that plan, it operates under a

structural conflict of interest. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  When

such a structural conflict exists, the reviewing courts are obligated to "consider that conflict as a

factor in determining whether the plan administrator has abused its discretion in denying benefits."

*Id.*  This factor, however, does not change the applicable standard of review, and its significance

"will depend upon the circumstances of the particular case." *Id.* at 108, 115 (citing *Firestone Tire*

*& Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

Here, Aetna underwrites the Plan and also administrates claims for benefits. (YP at 5, 9;

Docket No. 22 at 1.)  Thus it appears to be "the entity that both resolves benefits claims and pays

meritorious claims" and, "[a]s such, [it] suffers from a structural conflict of interest." *McDonough*

*v. Aetna Life Ins. Co.*, 783 F.3d 374, 379 (1st Cir. 2015).   Having already found—without

considering this additional factor—that Aetna abused its discretion, I need not delve into an

examination of Aetna's conflict.  I shall simply add that the structural nature of the claims process

adds fodder to my conclusion that Aetna failed to provide a principled, substantiated review as

mandated by ERISA. *See Buffonge*, 426 F.3d at 30.[23]

### *4.   The Remedy*

The First Circuit has taken a "flexible approach" to the available remedies for a claims

administrator's abuse of discretion. *Buffonge*, 426 F.3d at 31.  Because "'the variety of situations

is so great' in ERISA review[,] . . . the court must have 'considerable discretion' to craft a remedy

---

[23] Similarly, Aetna's late disclosure of documents may be taken into account as one of the "myriad
of relevant factors" the Court considers in determining whether the benefits denial amounted to an
abuse of discretion. *See Denmark v. Liberty Life Assur. Co. of Boston*, 566 F.3d 1, 9 (1st Cir. 2009)
(citing *Glenn*, 554 U.S. at 117).  Having found before reaching this additional factor that Aetna
abused its discretion, I need not explore the manner in which Aetna's conduct reflects on its ability
to engage in reasoned and principled decision-making.
Regarding the surveillance video of Plaintiff, I do not find that Aetna's failure to mention this
evidence constituted an abuse of discretion.  This evidence, showing three days of inactivity, did
not necessarily conflict with Aetna's determination that Plaintiff could perform sedentary work.

after finding a mistake in the denial of benefits." *Id.* (quoting *Cook*, 320 F.3d at 24).  As explained above, I have identified three primary reasons for determining that Aetna abused its discretion in denying Plaintiff's benefits: Inappropriate reliance on unreliable findings by Drs. Topper, McPhee, and Polanco; failure to address Plaintiff's qualifications and ability to engage in sedentary occupations in light of her medication requirements; and failure to address the findings in the APS and Capabilities and Limitations Worksheets showing that Plaintiff could not perform fulltime sedentary work.  These findings represent my opinion that Aetna erred in both the manner in which it conducted its review and in the substantive outcome of its decision.  After thoroughly reviewing the record, I am convinced that Plaintiff was denied benefits to which she was clearly entitled; therefore, I do not see the benefit, under these circumstances, of remanding this case to the claims administrator for further evaluation. *See id.*; *Cook*, 320 F.3d at 24.

## Conclusion

Plaintiff's motion for summary judgment (Docket No. 42) is ***granted*** and Defendants' motion for summary judgment (Docket No. 40) is ***denied***.  Plaintiff's long-term disability benefits are hereby reinstated and she is to be compensated for past benefits due beginning on May 25, 2012.


**SO ORDERED.**


*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**